# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **ONSET FINANCIAL, INC.**, a Utah corporation,<br><br>Plaintiff,<br><br>vs.<br><br>**VICTOR VALLEY HOSPITAL ACQUISITION, INC.**, a California corporation,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:17CV01133-DAK-BCW<br><br>Judge Dale A. Kimball |

This matter is before the court on Plaintiff's Motion to Dismiss counterclaims for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The court held a hearing on the motion on March 21, 2018. At the hearing, Plaintiff was represented by Stephen C. Tingey, and Defendant was represented by Sam Meziani. The court took the matter under advisement. The court has considered carefully the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motion. Now being fully advised, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Plaintiff Onset Financial, Inc. ("Onset") is a Utah corporation with its principal place of business in Utah. Defendant Victor Valley Hospital Acquisition, Inc. ("Victor Valley") is a California corporation with its principal place of business in California. Victor Valley owns and operates medical facilities in California. Victor Valley borrowed money from Onset through

three lease schedule agreements in connection with a Master Lease Agreement ("Master Lease"). These transactions were labelled as personal property leases.

In June 2014, Onset sent a proposal letter ("June Proposal") to Victor Valley dated June 10, 2014, which Victor Valley signed on June 11, 2014. The proposal letter contained three options at the end of the Base Period: (1) purchase the property for a price not less than 10% and not greater than 30% of the original property cost; (2) renew the lease; or (3) terminate the lease by returning all of the property to Onset. On or about August 4, 2014, Victor Valley, as lessee, executed and delivered to Onset, as lessor, the Master Lease, dated August 4, 2014. In connection with the Master Lease, Victor Valley executed and delivered to Onset Lease Schedule No. 001 ("Schedule 1"), dated August 4, 2014, including Amendment No. 1 and Amendment No. 2 to Schedule 1, dated December 9, 2014 and December 29, 2014, respectively; and Lease Schedule No. 002 ("Schedule 2"), dated August 15, 2014, including Amendment No. 1 to Schedule 2, dated July 1, 2015.

In October 2014, Onset sent another proposal letter ("October Proposal") to Victor Valley dated October 7, 2014. The October Proposal contained three options: (1) renew the property for a price to be determined by the parties; (2) renew the lease; or (3) terminate the lease by returning all of the property to Onset. The two parties then executed and entered into a third schedule in conjunction with the Master Lease: Lease Schedule No. 3 ("Schedule 3"), dated October 29, 2014, including Amendment No. 1 and Amendment No. 2 to Schedule 3, dated December 15, 2014 and January 6, 2015, respectively. In connection with each individual schedule, Victor Valley executed and delivered an Acceptance and Delivery Certificate to Onset.

Paragraph 20(n) of the Master Lease provided that, at the end of the base period, the schedule would automatically renew for twelve additional months. However, if Victor Valley

gave written notice to Onset, which was received by Onset at least sixty days before the end of the base period of any of the schedules, it would have two options: (1) purchase the property for a price determined by the parties; or (2) terminate the schedule and return the property to Onset. In order to choose the second option, Paragraph 20(n) required Victor Valley, *inter alia*, to enter into a new schedule to lease property that replaced the property listed in the old schedule. Options (1) and (2) would expire and the schedules would automatically renew if the parties did not come to an agreement on either option prior to the maturity of the base period; if Victor Valley failed to give written notice at least 150 days prior to the maturity of the base period; or if Victor Valley was in default. Additionally, the parties amended the terms of Paragraph 20(n) in relation to Schedules 1 and 2 but did not make any such amendments in relation to Schedule 3.

At the maturity of the initial twelve-month renewal period, the schedules would continue in effect for successive periods of six months, with each subject to termination at the maturity of any such successive six-month renewal period by either party giving thirty-day prior written notice of termination to the other party. Paragraph 20(n) states that Victor Valley acknowledges and agrees that it has read and understands the above provisions, and it concludes by stating Paragraph 20(n) contains the entire agreement and supersedes all prior communications, representations, and agreements, including proposal letters. Lastly, Paragraph 20(e) contained a choice-of-law provision declaring that Utah law would govern the transaction.

Victor Valley used the money to finance the purchase of new medical software, professional services, travel expenses, an electric generator, and construction improvements to its urgent care facility. Victor Valley purchased these items and services from third party contractors and vendors. After the initial terms of Schedules 1 and 3 had concluded, Victor Valley continued to make monthly payments. In September 2017, when Victor Valley

discovered it was still making payments beyond the initial term, it stopped making such payments.

## DISCUSSION

Onset moves to dismiss Victor Valley's counterclaims for failure to state a claim upon which relief can be granted according to Rule 12(b)(6) of the Federal Rules of Civil Procedure. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll well-pleaded factual allegations in the . . . complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006).

### A. **Equitable Rescission or Reformation**

Victor Valley's Counterclaim argues in favor of equitably rescinding or reforming the agreement made between the two parties based on the doctrine of mistake. More specifically, Victor Valley argues for equitable relief based on unilateral mistake. "When one party's mistake of fact is coupled with knowledge of the mistake by the other party or a mistake is produced by . . . inequitable conduct by the nonerring party, the mistake provides a basis for reformation or rescission." *Guardian State Bank v. Stangl*, 778 P.2d 1, 5 (Utah 1989). In order to "prevail on a theory of unilateral mistake, 'the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake.'" *Oliphant v. Estate of Brunetti*, 64 P.3d 587, 592 (UT App 2002) (quoting *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1209 (Utah 1987). However, "one party to an agreement does not have a duty to ensure that the other party has a complete and accurate understanding of all terms embodied in a written

contract. Rather, each party has the burden to read and understand the terms of a contract before . . . affix[ing] his or her signature to it." *Id.*

Victor Valley argues that Onset was aware of its mistake and engaged in inequitable conduct by (1) sending proposal letters that contained different end-of-term provisions than the Master Lease and (2) failing to negotiate or explain the automatic renewal provisions in the Master Lease to Victor Valley after obtaining Victor Valley's signature on the proposals. On their face, these pleaded facts fall short of the plausibility standard.

First, Onset alleges that it was not aware of Victor Valley's mistake due to Victor Valley's affirmative actions, and it was under no obligation to explain or ensure Victor Valley's understanding of the provisions of the contract. Even though Paragraph 20(n) of the Master Lease contained more complete end-of-term provisions than the proposals, Victor Valley affirmatively took steps to have such provisions amended in Schedules 1 and 2. If Victor Valley wanted to object to the automatic renewal terms, it had the opportunity to negotiate for further amendments just as it did with Schedules 1 and 2. Additionally, Victor Valley signed each individual proposal and the Master Lease and even specifically initialed Paragraph 20(n). While Victor Valley appears to argue it was bound after signing the proposals, the proposals expressly stated that they were not binding commitments.

Second, the end-of-term provisions in the proposal letters are not entirely inconsistent with the end-of-term provisions in the Master Lease. Even if they were, proposals generally serve just as their name suggests—as proposals. It would seem farfetched to categorize having more complete terms in the final documentation as inequitable conduct. Victor Valley had the burden to read and understand the terms of the contract. Without some other inequitable conduct, Victor Valley's claim of mistake is not legally cognizable. Similarly, as stated above, Victor

5

Valley had the opportunity to amend the provisions of Paragraph 20(n), and Onset was under no duty to ensure Victor Valley understood every provision. Therefore, the alleged facts of inequitable conduct do not rise to facial plausibility. Accordingly, Victor Valley's counterclaim for equitable rescission or reformation, as pleaded, fails as a matter of law.

### B. <u>Judgment Declaring the Lease is a Loan</u>

Victor Valley's Counterclaim seeks a declaratory judgment that the agreement between the two parties is actually a loan instead of a lease. This, Victor Valley asserts, is pivotal in defining its obligations under the agreement.

According to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Courts have "the power, but not the duty, to hear claims for declaratory judgment." *Acuity, A Mut. Ins. Co. v. McGinnis Homes, LLC*, 194 F. Supp. 3d 1204, 1209 (D. Utah 2016) (citation omitted). When considering such claims or counterclaims, if the court finds that they "merely restate[] an issue already before the court, '[i]t is well settled that such repetitious and unnecessary pleadings should be stricken'" or dismissed. *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, No. 1:16 CV 9788, 2018 WL 509960, at *8 (N.D. Ill. Jan. 23, 2018) (citation omitted). And "when a party has mistakenly designated a defense as a counterclaim," courts are permitted "to treat [the] counterclaim as an affirmative defense." *MRSI Int'l, Inc. v. Bluespan, Inc.*, No. 2:05CV00896 DAK, 2006 WL 2711791, at *2 (D. Utah Sept. 21, 2006) (citing *Rayman v. Peoples Savings Corp.*, 735 F. Supp. 842, 851-53 (N.D. Ill. 1990)).

Victor Valley's claim for declaratory relief defining the lease as a loan is repetitious and constitutes an issue already before the court. As its Third Affirmative Defense, Victor Valley

argues that the lease should be construed as a loan. Thus, the court will treat the counterclaim in its appropriate form as an affirmative defense. The court will address this affirmative defense as the case progresses through the various stages of litigation. Accordingly, Victor Valley's Counterclaim for a declaratory judgment is dismissed, but this decision does not hinder Victor Valley's ability to raise the defense nor give any assessment as to the merits of the defense.

**C. <u>California Usury Claim</u>**

Victor Valley alleges in its Counterclaim that the automatic-renewal provisions result in interest rates that violate California usury law. Onset, however, argues that California usury law is irrelevant because Utah law governs as established in the agreement's choice-of-law provision.

"To decide the effect of a contractual choice-of-law clause, courts look to the choice-of law [sic] rules in the forum state." *GRB Enterprises LLC v. JPMorgan Chase Bank, N.A.*, No. 2:11CV833DAK, 2012 WL 845418, at *3 (D. Utah Mar. 12, 2012) (citing *Been v. O.K. Indus.*, 495 F.3d 1217, 1236 (10th Cir. 2007)). "Utah courts generally uphold choice-of-law provisions based on the intent of the contracting parties and a respect of the parties' right to choose the governing law for a contract." *GRB Enterprises* at *3 (citing *Innerlight, Inc. v. Matrix Group, LLC*, 214 P.3d 854, 857-58 (Utah 2009). Under Utah law:

> [T]he law of the state chosen by the parties to govern their contractual rights and duties will be applied unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

*GRB Enterprises* at *3 (citing *Electrical Distributors, Inc. v. SFR, Inc.,* 166 F.3d 1074, 1084 (10th Cir.1999)).

In this case, Onset argues that Utah has a substantial relationship to the case because Onset is a Utah corporation with its principal place of business in Utah; the contracts were delivered to Onset in Utah; Onset signed and accepted the contracts in Utah; all payments were made to Onset or its assignees in Utah; and Onset negotiated the terms of the contracts on the phone and via email from its office in Utah. Victor Valley makes essentially the same arguments in favor of California law applying and also claims all of the goods and services it purchased were in California thereby establishing California has a greater relationship to the case. However, the court need only find that Utah has a substantial—not a greater—relationship to the transaction and the parties, which, in this case, it does.

Victor Valley argues that applying Utah law would be contrary to a fundamental California public policy. "California courts have discussed the issue whether the state's prohibition on usury is a fundamental public policy overriding parties' negotiated contractual choice of law provision." *Palm Ridge, LLC v. Ahlers*, No. EDCV0800652SGLOPX, 2008 WL 11339594, at *2 (C.D. Cal. June 23, 2008). The courts "have uniformly enforced contracts allowing interest rates above the limit under California law where there is shown a substantial relationship between the contract and the state which is referenced in the choice-of-law provision." *Id.* Because Utah has a substantial relationship to one of the parties and the transaction, Utah law governs.

**CONCLUSION**

Based on the above reasoning, Plaintiff's Motion to Dismiss is GRANTED, and Defendant's counterclaims are dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

DATED this 4th day of April, 2018.

BY THE COURT:

_____
Dale A. Kimball,
United States District Judge